(No. 52748.—

CATERPILLAR TRACTOR COMPANY, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Hattie B. Daugherty, Appellant).

*Opinion filed September 15, 1980.*

Harvey & Stuckel, Chartered, of Peoria (David W. Stuckel, of counsel), for appellant.

Forrest D. Serblin, of Peoria, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Hattie Daugherty filed a claim under the Workmen's Compensation Act (Ill. Rev. Stat. 1973, ch. 48, par. 138.1 *et seq.*) for an injury to her right thumb which she allegedly sustained on November 21, 1974, while employed at the Caterpillar Tractor Company in East Peoria. An arbitrator held in her favor and made an award which included compensation for the permanent loss of 80% of the use of her right thumb. The Industrial Commission affirmed after making a slight modification as to attorney fees, but the circuit court of Peoria County reversed the Commission's decision as contrary to the manifest weight of the evidence. The claimant appealed directly to this court under Rule 302(a)(2). 73 Ill. 2d R. 302(a)(2).

When the claimant began her employment with Caterpillar Tractor in April of 1974 she was assigned to lift metal cores of varying sizes from a conveyor line. The weights of these cores according to the record ranged from 5 to 85 pounds. The claimant testified that she removed between 100 and 200 cores each half hour depending upon their weight and size. She stated that on November 21, 1974, when pulling down a "big core" from the conveyor belt, she struck her right hand against the line and injured her thumb. She said she received permission from her foreman to visit the first-aid room. The claimant received aspirin from a company nurse and was allegedly told to schedule an appointment with her own doctor. Three weeks later, on December 12, she visited Dr. G. G. Spano, who advised her that her right thumb was dislocated. He sent the claimant to Proctor Community Hospital for X rays and later referred her to Dr. Jay Alameda, who had her admitted to St. Francis Hospital. On January 10, 1975, he performed an arthrodesis on her right thumb and placed it in a cast in an attempt to heal what he described as a fracture of the

metacarpal phalangeal joint. The cast was changed several times and was finally removed on March 4. The claimant returned to work in April 1975 and resumed her duties as a core handler. Several months later she returned to Dr. Alameda complaining again of pain in the right thumb. Dr. Alameda found that the healing which had taken place while her thumb was in a cast had "dissolved," as his report puts it. A re-arthrodesis of the fractured joint was scheduled. The claimant entered the hospital on May 7, 1976, and the surgery was performed the following day. On this occasion a small screw was inserted for a better fusion. The final cast was removed on June 18, but because of continued swelling the claimant was not able to return to work until August. Following an examination by the company doctor, Dr. J. R. Barron, she was placed on lighter duty in another department.

She continued in this assignment with no apparent problems until October, when she requested an appointment with Dr. Barron. In his medical report he states:

> "Examination today (10-21-76) reveals a deformation in size and shape at the level of the MP joint of the right hand thumb. Grip is good and strong on both hands. With the fingers extended and the thumb pressed against the side of the hand, she could extend the thumb upward and this movement is limited on the right to $45°$, in comparison with $90°$ in the left."

She was again referred to Dr. Alameda, who determined that the second arthrodesis had been unsuccessful. His suggestion of a third operation was rejected by the claimant, who sought a second opinion from Dr. David Connor. Dr. Connor agreed with Dr. Alameda's recommendation, and after receiving the claimant's consent he performed a pseudoarthrosis on her thumb on January 17, 1977. During this procedure Dr. Connor attempted to fuse the metacarpal phalangeal joint of the right thumb with a bone grafted from the right iliac crest of the claimant's pelvis. She returned to work in June, where she resumed

her duties in the wire room. The claimant still complains of stiffness in her right thumb and that it lacks full mobility.

In support of the circuit court's reversal of the Commission's award the respondent advances several contentions. It argues that the evidence shows that the claimant did not notify it of an alleged accident on November 21, 1974, and that she did not show a causal connection between this "incident" and the resulting problem with her right thumb. The respondent relies heavily on the claimant's testimony before the arbitrator that her injury did not arise from an accident at work but from an earlier fall in 1972 before she was employed by the respondent.

The respondent also refers to an insurance form which was signed by the claimant. In response to one of the questions she wrote that she was first disabled by "this sickness or injury" on January 9, 1975. She also responded "no" to the question of whether an accidental injury was involved.

The respondent notes, too, that though most of the reports which discuss the claimant's medical history show that the injury was caused by an accident at work the records of Dr. Alameda indicate that the condition of her thumb was caused by a "fall" in November of 1974. Finally, the respondent says that it has no record that the claimant ever visited its first-aid station in November or December of 1974, thus questioning whether the claimant notified the respondent within the required statutory period of 45 days. Ill. Rev. Stat. 1973, ch. 48, par. 138.6(e).

The record does show apparent inconsistencies in the claimant's testimony. On cross-examination she was asked about her conversation with the foreman, whom she said she had notified upon injuring her thumb. She described the conversation: "He asked me what was the matter with my thumb and I told him I fell a couple of years ago and

injured it." She also told Dr. Spano, Dr. Alameda and the company nurse of having injured her thumb in a fall.

The claimant acknowledges there are some contradictory or ambiguous statements, but she argues that the award by the Industrial Commission was not contrary to the manifest weight of the evidence. This is indeed the pivotal question. The claimant answers the claim that her injury was due to the non-work-related fall in 1972 by noting she also testified that the accident in 1972 was minor and did not require any medical attention. She points out that a physical examination conducted by the respondent company before she was hired did not reveal any defect or problem with her right hand or thumb. She also argues that the uncontradicted medical finding of an unhealed fracture of her right thumb long after she was employed by the respondent shows that an accidental injury occurred at work and not in a fall two years prior to her employment by Caterpillar Tractor.

In response to the respondent's relying on the absence of a record of a visit to the first-aid station in November or December of 1974 the claimant calls attention to the nurse's testimony before the Commission that no permanent record of any accident is kept unless an employee is examined by the company's doctor. As the claimant was not referred to Dr. Barron, the respondent's physician, in November of 1974 no permanent record of the visit to the station would appear in the respondent's files. She also observes that all of the medical reports in evidence except one set out a medical history which unequivocally describes the claimant's injury as having been received in a work-related accident. The exception is the above-mentioned report of Dr. Alameda referring to the claimant's being injured in a fall in November 1974. Dr. Alameda was making reference to a case history taken earlier by a medical resident, and it is not unreasonable to assume that the report refers to the claimant's earlier

fall in 1972, which has been discussed.

The claimant argues that, though the respondent claims it never received notice of the claimant's injury, significantly it did not seek to rebut her testimony that she received permission from a foreman named "Dick" to visit the first-aid station on November 21, 1974.

The claimant's negative response to the question on the company's insurance form as to whether she had suffered an accidental injury is not, she argues, to be judged decisive on the issue of causation. She observes that this court has held that such evidence is but a factor for the Commission to consider in evaluating an employee's claim of a compensable injury. *Atlantic & Pacific Tea Co. v. Industrial Com.* (1977), 67 Ill. 2d 137, 141; *Thrall Car Manufacturing Co. v. Industrial Com.* (1976), 64 Ill. 2d 459, 464.

There was conflicting evidence as to the causation of the claimant's injury, and the circuit court certainly did not act arbitrarily in setting aside the finding of the Industrial Commission. The question is not an easy one to decide, but we have concluded our holding must be that the Commission's finding was not contrary to the manifest weight of the evidence. It is axiomatic that the Commission has the first responsibility of resolving conflicts of evidence. A court, including this one, will not set aside a finding of the Commission unless it is contrary to the manifest weight of the evidence. This is so even though the court might have drawn different inferences and reached a conclusion different from the Commission's. *Phelps v. Industrial Com.* (1979), 77 Ill. 2d 72; *A. O. Smith Corp. v. Industrial Com.* (1977), 69 Ill. 2d 240.

Particularly persuasive here is the evidence of the physical examination of the claimant prior to being accepted for employment, which did not disclose any physical disability or limitation, and her being given the physically demanding assignment of handling metal cores

weighing up to 85 pounds. She worked at this assignment from April until November 27, 1974, when she testified she injured her thumb when pulling down a "big core." She testified without contradiction that she physically lifted 100 to 200 cores every half hour or, presumably, 1,600 to 3,200 cores each day. The Industrial Commission well may have regarded all of this as convincing evidence that the fracture and dislocation of the claimant's thumb was sustained at her employment and not, for example, in the earlier fall.

Accordingly, the judgment of the circuit court of Peoria County is reversed.

*Judgment reversed;*
*award reinstated.*